NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————
|
IN RE INTERPOOL, INC.                    |          Civ. No. 04-321 (SRC)
SECURITIES LITIGATION                |
———————————————————|          **OPINION**


**CHESLER**, District Judge

     This matter comes before the Court on Defendants' Interpool, Inc., Raoul J. Witteveen,

Mitchell I. Gordon, William Geoghan, and Martin Tuchman (collectively, the "Defendants")

motions to dismiss Plaintiffs' consolidated amended class action complaint (the "complaint")

[docket numbers 25, 21, 26, 28, and 31, respectively].  The Court, having considered the papers

submitted by the parties, for the reasons set forth below and for good cause shown, will grant

Defendants' motions to dismiss.


**BACKGROUND:**

     In light of the fact that Defendants' motions are made pursuant to Federal Rule of Civil

Procedure 12(b)(6), the Court "must accept as true the facts as alleged in the [complaint] and any

reasonable inferences that can be drawn therefrom."  In re Campbell Soup Co. Secs. Litig., 145

F. Supp. 2d 574, 579 (D.N.J. 2001) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).  The

following facts gleaned from Plaintiffs' complaint[1] and opposition brief [2] therefore do not

---

    [1]  References to the Consolidated Amended Class Action Complaint are cited as "¶ __."

    [2]  References to Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss are
cited as "Pl. Opp. __."

represent findings of fact by the Court.

## I. Background on Interpool:

Founded in 1968, Interpool is now one of the world's leading suppliers of equipment and services to the transportation industry and is primarily engaged in the leasing of containers and chassis (i.e., trailers for transport).  (See ¶ 33).  The Company primarily conducts this business through two subsidiaries.  The first subsidiary, Interpool Limited, engages in the long-term leasing of freight containers.  (See id.).  The second subsidiary, Trac Lease, Inc., leases chassis to shipping lines, railroads and trucking firms and operates pools in the United States that allow shippers to share and trade available chassis.[3]  (See id.).  "In addition to the Company's container and chassis leasing operations, during the Class Period the Company also derived revenues from Interpool's computer leasing segment."  (Id.).  Interpool became a publicly-owned company in 1993, trading on the New York Stock Exchange under the symbol "IPX."

In February 1998, Interpool entered into an "investment banking" consulting agreement with Atlas Capital Partners, LLC ("Atlas Capital"), a private equity investment and consulting firm.  (See ¶¶ 18, 34).  At the time, the President of Atlas Capital was Defendant Mitchell I. Gordon.  (See ¶ 18).  Mr. Gordon also served as a director of Interpool.  (See id.).

In April 1998, just a few months after this deal was cut, Interpool began to embark on a series of acquisitions that greatly expanded the scope of the Company's operations and added to the complexity of its financial reporting procedures and controls.  (See ¶ 34; see also ¶¶ 35-37)

---

[3]  "Historically, the Company's container leasing segment has been Interpool's most profitable segment, providing more than 80% of the Company's operating income (before taxes and extraordinary items)."  (Id.).

(describing the various complex acquisitions that Interpool made starting in April 1998).  For

example, "Interpool acquired a 50% common equity interest in Container Applications

International, Inc. ('CAI')," a company that "owns and leases its own fleet of containers and also

manages, for a fee, containers owned by Interpool and other third parties."  (¶ 35).  Likewise, in

"May 1999, the Company acquired a 51% interest in Personal Computer Rentals, Inc. ('PCR'), a

privately-held lessor of computers and related equipment for approximately $6.7 million."  (¶

36).


## II.  Individual Defendants:

The individual Defendants who are alleged to have committed fraud upon Interpool's

investors include the following:

A.  Martin Tuchman ("Tuchman"):

Mr. Tuchman was Interpool's Chairman of the Board of Directors and Chief Executive

Officer during the Class Period.  (See ¶ 16).  He is Interpool Limited's Chairman of the Board of

Directors, Chief Executive Officer, director and co-founder.  (See id.).  He was also Trac Lease's

director since June 1987, President from June 1987 through January 1994 and currently its

Chairman and Chief Executive Officer.  (See id.).  Additionally, Tuchman has served as

President and Chief Operating Officer of Interpool since October 2003.  (See ¶ 16).

B.  Raoul J. Witteveen ("Witteveen"):

Mr. Witteveen was Interpool's President, Chief Operating Officer and a director of

the Company who also served as Chief Financial Officer from 1993 to 2000.  (See ¶ 17).  He was

Interpool Limited's President, Chief Financial Officer and a director since 1988 who also served

as Chief Financial Officer from 1988 to 2000.  (See id.).  From 1982 to 1986, Witteveen served in a variety of management capacities at Thyssen-Bornemisza N.V., the former parent of Interpool Limited.  (See ¶ 17).  Additionally, he was Trac Lease's co-founder and Chief Financial Officer, Vice President and a director of Trac Lease since June 1987.  (See id.).

C.  Mitchell I. Gordon ("Gordon"):

Mr. Gordon was Interpool's director since 1998 and Chief Financial Officer and Executive Vice President of the Company since October 2000.  (See ¶ 18).

D.  William Geoghan ("Geoghan"):

Mr. Geoghan was Interpool's Senior Vice President and Principal Accounting Officer. (See ¶ 19).

III.  Overview of Interpool's Allegedly False Statements:

Plaintiffs contend that the Defendants repeatedly made "untrue statement[s] of a material fact" and omitted "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  (Pl. Opp. 7).

The allegedly false statements made by the Defendants that allegedly artificially inflated Interpool stock in violation of Rule 10b-5 can be categorized into three groups.  First, the Defendants allegedly repeatedly made false statements in Interpool's annual Form 10-Ks and quarterly Form 10-Qs filed with the SEC that contained the Company's financial statements.[4]

---

[4]  Because Interpool stock was publicly-traded, the Company and its officers, including the above Defendants, were required to file annual and quarterly reports.  See 15 U.S.C. § 78m(a); see also 17 C.F.R. § 240.13a-1 (SEC regulation requiring companies to file "an annual

Second, the Defendants allegedly made false statements in press releases that preceded the filing of these SEC Forms and announced the Company's quarterly and annual financial results that would be filed in the SEC Forms.  Third, CEO Tuchman, speaking on behalf of himself and the Company, allegedly repeatedly made false statements in public conferences related to the announcement of these results.  (Pl. Opp. 8).

## IV.  Allegedly False Statements Made by Defendants:

At the beginning of the Class Period, the Defendants reported for fiscal year 1998 revenues of $182.3 million with a net income for Interpool of $37.6 million, or $1.31 of earnings per share.  (¶ 40).  In addition, the Company's total stockholders' equity was reported to be $283.2 million.  (Id.).  Finally, as part of the Company's assets, "Interpool reported direct financing leases of $356.4 million and leasing equipment net of depreciation and amortization of $736.1 million, which together represented more than 80% of the Company's reported assets at December 31, 1998."  (Id.).

Plaintiffs allege that all of these financial numbers were false and that the Defendants knew or, at the very least, recklessly ignored that fact.  Plaintiffs contend that these financial numbers constitute fraud for the following reasons, as explained in paragraph 42 of the Complaint:

---

report... for each fiscal year"); 17 C.F.R. § 240.13a-13 (SEC regulation stating publicly-traded companies "shall file a quarterly report").  See generally SEC Reg. S-X, 17 C.F.R. pt. 210 (containing the requirements for reporting the financial statements).

Interpool's annual Form 10-Ks were signed by all of the Individual Defendants.  (Pl. Opp. 8).  In addition, the Company's quarterly Form 10-Qs were signed by CEO Tuchman and Principal Accounting Officer Geoghan.  (Id.)

(a)     Interpool **lacked adequate internal controls** and was therefore unable to ascertain the true financial condition of the Company;

(b)     certain leases that had been accounted for as operating leases should have been accounted for as direct finance leases. In addition, revenue related to leases classified as finance leases had been **materially understated**;

(c)     the Company lacked any documentation for an interest rate swap designed to hedge interest rate fluctuations for a chassis securitization facility and was therefore required to treat changes in the fair market of the swap as gains or losses in the Company's income statement, as a result of Interpool's improper hedge accounting for the swap **the Company's earnings were materially overstated**;

(d)     that reserves established for residual guaranties under certain financings were **materially overstated**;

(e)     income earned on intercompany transactions with Interpool's subsidiary CAI had not been eliminated resulting in a **material overstatement of the Company's earnings**;

(f)     receivables related to Interpool's trailer fleet had been **materially overstated**;

(g)     deferred tax asset valuation allowances related to the realization of Interpool's net operating losses and other tax assets were **materially understated**;

(h)     the net book value of certain containers, acquired from an investment partnership in December 1996, was **materially overstated**;

(i)     the earnings were **materially misstated** relating to certain intercompany accounts with foreign subsidiaries that had not been reconciled at December 31, 2000 and 2001;

(j)     the earnings were **materially overstated** based on improper accounting for an insurance claim for a defaulted lease, which also materially overstated receivables due from an insurance carrier and, correspondingly, reduced lease revenues and other income for certain amounts billable under the lease contract that are not probable of collection;

(k)     that Defendants **omitted other material adjustments**, consisting primarily of changes in accruals and estimates as well as reclassification of previously recorded entries to proper periods.

(Pl. Opp. 11-12) (emphasis in original); (¶ 42).

As a result of the foregoing, the Defendants allegedly made untrue statements related to

(1) Interpool's net income (and therefore the company's earnings per share), (2) Interpool's

stockholders' equity, and (3) Interpool's revenues.  Plaintiffs allege that throughout the Class

period, the Defendants repeatedly made similar false statements for the same reasons.  (See ¶¶ 43

(fiscal year 1999), 45-47 (1Q 2000), 49-51 (2Q 2000), 53-55 (3Q 2000), 57-59 (4Q and fiscal

year 2000), 61-63 (1Q 2001), 65-71 (2Q and 3Q 2001), 73-75 (4Q and fiscal year 2001), 77-79

(1Q 2002), 81-84 (2Q and 3Q 2002)).

        "Put simply," Plaintiffs contend that "the financial statements published by Interpool

were not prepared in accordance with GAAP and were therefore materially false and

misleading."  (Pl. Opp. 13; ¶ 42(l); see also ¶¶ 94-134 (detailing how the financial statements

violated GAAP)).

        Plaintiffs further allege that during the Class Period, Defendants intentionally or

recklessly made two additional sets of false statements that also violated Rule 10b-5.  First, on

August 9, 2000, Interpool filed its report with SEC on Form 10-Q for the second quarter of 2000.

(See ¶ 51).  In this SEC form, the Defendants stated that Interpool was adopting of Statement of

Financial Accounting Standards 133 ("SFAS 133"), which is entitled "Accounting for Derivative

Financial Instruments and Hedging Activities."  Among other things, SFAS 133 requires a

company to "formally document, designate, and assess the effectiveness of transactions that

receive hedge accounting."  (¶ 51) (emphasis removed).  Plaintiffs contend, however, that "the

documentation of the hedging relationship [entered into by Interpool] did not exist as required by

SFAS 133 and, therefore, the swap [that was recorded] should have been accounted for as a

speculative contract when the Company adopted SFAS 133 in January 2001."  (¶ 52(a)); (see also

¶ 38) (describing the hedging relationship and swap that Interpool entered into).  Plaintiffs allege

that from this time forward, all of Interpool's statements regarding its compliance with GAAP

and its calculation of the Company's assets were false and misleading.  (See ¶¶ 56, 60, 64, 72,

76, 80, 85).

Second, in September 2001, "the Company announced its intention to exit the computer leasing business and commenced a liquidation plan which included a purported 'sale' of PCR to an investor group comprised primarily of PCR management."  (¶ 36; see also ¶¶ 69-70). Interpool had acquired a 51% interest in PCR two and half years earlier in May of 1999 – one of the primary acquisitions that Interpool had made in its expansion that began a year earlier.  (See ¶ 36).  Following the announcement of its sale of PCR in September 2001, "the Company began reporting its computer segment results as 'discontinued' operations."  (Id.).  However, the Defendants were prohibited from reporting the sale of PCR in such a manner because "certain directors and officers, including Defendants Tuchman and Witteveen had guaranteed, or intended to guarantee, certain of PCR's lines of credit."  (¶ 76; see also ¶ 121) (describing SFAS No. 144 and the SEC's Staff Accounting Bulletin Topic 5E which provides guidance on when a company should report the sale of such assets).

Thus, as management of Interpool later admitted in its restatement, "the requirements for discontinued operation accounting treatment were not satisfied."  (¶ 3).  As a result, "the Company's true operating results were [allegedly] materially misrepresented by millions of dollars."  (¶ 36).  Plaintiffs claim that from this time forward, all of Interpool's statements regarding its compliance with GAAP and its calculation of operating results (and hence its net income) were false and misleading.  (See ¶¶ 76, 80, 85).

Plaintiffs contend that the fact that all of the statements detailed in the Complaint (see ¶¶ 40-85) were untrue is not in dispute.  (See Pl. Opp. 15).  GAAP only requires a restatement when information in previously provided financial statements is both inaccurate and material.

8

Accounting Principles Board ("APB") Opinion No. 20 specifically states that a restatement is proper if based on "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared." APB 20; (¶13).  A restatement is specifically not proper for "new information or subsequent developments" or for "better insight or improved judgment."  (Id.).  Once GAAP was applied, Interpool was forced to issue a restatement of its financial results.  Plaintiffs allege that the full extent to which the financial statements had been false was finally revealed on January 9, 2004. (See ¶ 8).

Plaintiffs state that the aggregate effect, according to Interpool, of the restatement of the Company's historical financial statements, was the following:

(1)     net income was materially overstated by $14.4 million or 51% for the year ended December 31, 2001;

(2)     net income was materially overstated during the quarters ended March 31, 2002, June 30, 2002 and September 30, 2002, by more than 72%, 45% and 15%, respectively;

(3)     net income was materially understated by $.2 million for the year ended December 31, 2000;

(4)     retained earnings was materially overstated at January 1, 2000 by $2.0 million;

(5)     stockholders' equity was materially overstated by $11.2 million and $1.7 million for the years ended December 31, 2001 and 2000, respectively;

(6)     net investment in direct financing leases was materially understated by $46.1 million and $61.8 million at December 31, 2001 and December 31, 2000, respectively;

(7)     leasing equipment, net was materially overstated by $37.5 million, and $24.7 million at December 31, 2001 and December 31, 2000, respectively.

(Pl. Opp. 16-17); (¶¶ 8, 109, 110, 120).

Plaintiffs contend that all of the above clearly demonstrates that the financial statements and accompanying statements and press releases were false and misleading when issued, and

that the revelation of this misinformation had a materially adverse impact Interpool's investors. (Pl. Opp. 17; see also ¶ 9) ("In total, the price of Interpool common stock alone has fallen almost 50% from its Class Period trading high.").  Plaintiffs further contend that these events could not have transpired without the knowing or reckless participation of the Defendants.

**PROCEDURAL HISTORY:**

Plaintiffs filed a Consolidated Amended Class Action Complaint on or about January 23, 2004 in which they allege certain securities laws violations.  Specifically, the First Claim alleges that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  (¶¶ 146-57).  The Second Claim alleges that the Individual Defendants violated Section 20(a) of the Exchange Act.  (¶¶ 158-61).  Defendants filed separate motions to dismiss the complaint on or about November 22, 2004, and November 23, 2004.[5]

**DISCUSSION:**

**I.  Applicable Standards:**

A.  Federal Rule of Civil Procedure 12(b)(6):

------

[5]  References to the Memorandum of Law in Support of Defendant Interpool, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint are cited as "Interpool MTD __."  References to the Memorandum of Law in Support of Defendant Mitchell I. Gordon's Motion to Dismiss the Complaint are cited as "Gordon MTD __."  References to the Memorandum of Law in Support of Defendant Raoul J. Witteveen's Motion to Dismiss are cited as "Witteveen MTD __."  References to the Memorandum of Law in Support of Defendant William Geoghan's Motion to Dismiss are cited as "Geoghan MTD __."  References to the Memorandum of Law in Support of Defendant Martin Tuchman's Motion to Dismiss are cited as "Tuchman MTD __."  The Reply papers from each of these Defendants are cited as "__ Reply __."

Federal Rule of Civil Procedure 12(b)(6) states that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  A claim will be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  In re Rockefeller Ctr. Props., Inc. Secs. Litig., 311 F.3d 198, 215 (3d Cir. 2002) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  The question thus becomes whether the plaintiff can prove any set of facts consistent with his or her allegations that will entitle him or her to relief and not whether that person ultimately will prevail.  In re Cendant Corp. Secs. Litig., 76 F. Supp. 2d 531, 534 (D.N.J. 1999).  Although a court will treat all well-pleaded allegations in the complaint as true, courts "are not required to credit bald assertions or legal conclusions," nor will the presumption of truthfulness apply to "legal conclusions draped in the guise of factual allegations."  Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 625 (D.N.J. 2003) (citations omitted).

Moreover, in deciding a 12(b)(6) motion, courts "may not consider matters extraneous to the complaint."  Id. (citing In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  The Third Circuit has noted an exception to the general rule to permit that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the [Rule 12(b)(6)] motion into one for summary judgment."  Burlington Coat Factory, 114 F.3d at 1426 (quotation omitted); see also In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 368 n.9 (3d Cir. 1993) (noting that courts may consider documents attached to defendant's motion to dismiss "if the plaintiff's claims are based on the documents[s]").  "The rationale underlying this exception is that the primary problem raised by considering documents outside the complaint – lack of notice to the plaintiff – is dissipated where [the] plaintiff has

actual notice and has relied upon the documents in framing the complaint."  Jones, 274 F. Supp. 2d at 625-26.  Similarly, courts are free to consider matters of public record that are referenced in the complaint.  Id.

B.  Section 10(b) of the Exchange Act and Rule 10b-5:

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Further, Rule 10b-5 renders illegal the making of "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchaser or sale of any security."  17 C.F.R. § 240.10b-5(b).  Section 10(b) and Rule 10b-5 therefore require that a plaintiff must "plead that (1) the defendant made a [misstatement] or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injury."  In re Campbell Soup Sec. Litig., 145 F. Supp. 2d 574, 583 (D.N.J. 2001) (citing EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 871 (3d Cir. 2000)).

Materiality of a fact is proved upon a demonstration that there is a "substantial likelihood that a reasonable investor would have viewed it as having significantly altered the total mix of information available to the public."  Jones, 274 F. Supp. 2d at 627 (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992)).  Although "[m]ateriality is a mixed question of law and fact," Jones, 274 F. Supp. 2d at 627, the Third Circuit has adopted a specific

analysis for determining materiality within the context of an efficient securities market.  That analysis turns on the theory that in an efficient market, "information important to reasonable investors . . . is immediately incorporated into the stock price."  Burlington Coat Factory, 114 F.3d at 1425.  Accordingly, when a stock is traded in an efficient market, the materiality of the disclosed information may be calculated by viewing the movement of the stock's price immediately after the disclosure.  Id.

In an action alleging misrepresentation or omission of material facts, 10b-5 liability will not attach unless a plaintiff can demonstrate that the defendant had a duty to disclose.  Thus, silence, absent a duty to disclose, is not misleading under Rule 10b-5.  Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); In re Time Warner, Inc. Secs. Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact").  Once disclosure is made, however, an obligation to make the disclosure accurate will attach.  Within the context of Section 10(b) and Rule 10b-5 actions, "[a] statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it."  In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 573 (D.N.J. 2001).


C.  Federal Rule of Civil Procedure 9(b):

Claims brought pursuant to Section 10(b) and Rule 10b-5, *i.e.*, fraud claims, must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  See Burlington Coat Factory, 114 F.3d at 1417.  Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Fed. R. Civ. P. 9(b).  As one Court has observed, "[t]he purpose of the heightened pleading

requirement is to give defendants notice of the claims against them, to provide an increased

measure of protection for their reputations, and to reduce the number of frivolous suits brought

solely to extract settlements."  In re Party City Sec. Litig., 147 F. Supp. 2d 282, 298 (D.N.J.

2001) (quotation omitted).  Accordingly, plaintiffs alleging violations of Section 10(b) and Rule

10b-5 must plead those claims with "particularity."  In that respect, "boilerplate and conclusory

allegations," without specific facts in support of those allegations, "will not suffice."  Burlington

Coat Factory, 114 F.3d at 1418.


D.  Private Securities Litigation Reform Act:

     In addition to the heightened requirements of Rule 9(b), plaintiffs seeking redress pursuant to

federal securities laws must meet the pleading requirements set forth in the Private Securities

Litigation Reform Act of 1995 ("PSLRA").  See 15 U.S.C. § 78u-4.  The burden imposed by the

PSLRA has been well articulated as follows:

> [T]he PSLRA requires a complaint, which asserts a Section 10(b) claim,
> set forth "each statement alleged to have been misleading, the reason or
> reasons why the statement is misleading, and if an allegation regarding
> the statement or omission is made on information or belief, the
> complaint shall state with particularity all facts on which that belief is
> formed."

Party City, 147 F. Supp. 2d at 299 (D.N.J. 2001) (quoting 15 U.S.C. § 78u-4(b)(1))

(emphasis in original).

     In respect of allegations of scienter, the PSLRA requires that the complaint must "state

with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u-4(b)(2);  see also Oran v. Stafford, 226 F.3d 275, 288

(3d Cir. 2000) (same).  A complaint that fails to meet any of the above pleading requirements

must be dismissed.  15 U.S.C. 78u-4(b)(3)(A).


E.  Scienter and the PSLRA:

As noted above, the procedural requirements of the PSLRA dictate that a plaintiff's

complaint must "state with particularity facts giving rise to a strong inference that [defendants]

acted with the required state of mind to survive a motion to dismiss."  See 15 U.S.C. § 78u-

4(b)(2); See also Oran, 226 F.3d at 288 (same).  Moreover, "[w]hile under Rule 12(b)(6) all

inferences must be drawn in plaintiffs' favor, inference of scienter do not survive if they are

merely reasonable . . . .  Rather, inferences of scienter survive a motion to dismiss only if they

are both reasonable and 'strong' inferences."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 150

(3d Cir. 2004) (internal citation omitted).  With respect to the nature of the proofs required to

successfully plead scienter, the Third Circuit has held that scienter may be demonstrated by (1)

"alleging facts establishing a motive and an opportunity to commit fraud," or (2) "by setting

forth facts that constitute circumstantial evidence of either reckless or conscious behavior."  In

re Advanta Corp., 180 F.3d 525, 534-35 (3d Cir. 1999) (internal citation omitted).  "A reckless

statement is a material misrepresentation or omission 'involving not merely simple, or even

excusable negligence, but an extreme departure from the standards of ordinary care, and which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it.'"  GSC Partners CDO Fund v. Washington,

368 F.3d 228, 239 (3d Cir. 2004) (quoting Advanta, 180 F.3d at 535).  Likewise, the Third

Circuit has noted that "conscious behavior" includes "intentional fraud or other deliberate illegal behavior." Advanta, 180 F.3d at 535.

## II.  Analysis:

A.  Scienter:

Defendants maintain that the complaint should be dismissed because Plaintiffs have failed to plead facts supporting a strong inference that they acted with scienter.  (See, Interpool MTD 16-29; Gordon MTD 28-40; Witteveen MTD 6-10; Geoghan MTD 7-11; Tuchman MTD 2-3).

As discussed above, the Third Circuit law is that scienter may be demonstrated by either (1) "alleging facts establishing a motive and an opportunity to commit fraud," or (2) "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." Advanta, 180 F.3d at 534-35 (citation and quotation omitted).  Therefore, the Court will now analyze whether Plaintiffs have pled allegations sufficient to meet either of these alternative requirements.

*1. Motive and Opportunity:*

As the Third Circuit clarified in Advanta, "[m]otive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter."  180 F.3d at 535 (quoting 15 U.S.C.A. § 78u-4(b)(2)).  Therefore, under the PSLRA, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a

fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." Id. Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004).

A showing of motive requires allegations that the individual corporate defendants stood to gain in "concrete and personal" ways from one or more of the alleged misleading statements or wrongful omissions. Wilson v. Burnstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002). A showing of opportunity requires a showing that there were "means and likely prospect of achieving such concrete benefits by the means alleged." Wilson, 195 F. Supp. 2d at 633 (internal citations omitted). As Plaintiffs correctly point out, "[i]n this case, defendants' opportunity to commit fraud is clear; each defendant was a senior corporate officer who controlled public dissemination of information about the company." (Pl. Opp. 39) (quoting In re Unisys Corp. Sec. Litig., No. Civ. A 00-1849, 2000 WL 1367951, at *6 (E.D. Pa. Sept. 21, 2000)). See also San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Companies, Inc., 75 F.3d 801, 813 (2d Cir. 1996) (finding "no doubt" that defendants had the opportunity to manipulate stock price as they held the highest positions of authority and power in the company). Defendants do not contest the assertion that by virtue of their positions in the company they indeed had an *opportunity* to commit the alleged fraud. The more difficult issue, however, is whether the complaint adequately alleges that Defendants had a *motive* to commit the alleged fraud.

Plaintiffs, in their opposition brief, allege the following bases of motivation for Defendants to commit the alleged fraud:

> Motivation is equally clear: "Defendants were further motivated to report Interpool's false and misleading financials so that Interpool could acquire the North American intermodal division of Transamerica Leasing, Inc., a subsidiary of Transamerica Finance Corporation and AEGON N.V. (NYSE: AGE), based in Purchase, New York for $675 million in cash." ¶ 140. "Interpool needed to secure credit facilities, which it did during the Class Period. For example, in 2002, the Company obtained a $540 million asset-backed financing facility." ¶ 141. Similarly, Defendants were motivated to artificially inflate their financial number [sic] "given the importance of Interpool's cash flow on its debt rating." ¶ 110; see also ¶ 111 (explaining Interpool's motivation to release artificially inflated numbers related to cash flow). "Lastly, Defendants were motivated to perpetrate this fraudulent scheme in order to complete numerous offerings." ¶ 142.

(Pl. Opp. 39-40).

In essence then, Defendants' alleged motivations were the following: (1) to acquire Transamerica Leasing, Inc. for $675 million in cash; (2) to secure credit facilities; (3) to artificially inflate numbers related to cash flow on its debt rating; and (4) to complete numerous offerings. The Court will now address each of these in turn.

Plaintiffs allege that Defendants were motivated to "report Interpool's false and misleading financials so that Interpool could acquire the North American intermodal division of Transamerica Leasing, Inc., a subsidiary of Transamerica Finance Corporation and AEGON N.V. (NYSE: AGE), based in Purchase, New York for $675 million in cash." (Pl. Opp. 39) (citing ¶ 140). Courts have found sufficiently alleged motive to mislead investors by artificially inflating the company stock price where the acquisitions were at least partially funded by the company stock. See, e.g., In re: ATI Technologies, 216 F. Supp. 2d 418, 438 (E.D.Pa. 2002) (finding sufficiently alleged motive and opportunity to mislead where acquisition of company for $453 million was payable only in company stock); Marra v. Tel-Save Holdings, Inc., 1999 WL 317103 (E.D.Pa. 1999) ("Because plaintiffs have identified an acquisition that took place

during the class period and was funded with a combination of Tel-Save's stock and cash, a strong inference of fraudulent intent is possible").  Courts have even found motive and opportunity to be sufficiently alleged even where the acquisition was not funded by company stock, but where plaintiffs specifically identified how the company achieved a concrete benefit by maintaining stock prices until the acquisition was complete.  See In re AT&T Corp. Sec. Litig., 2002 WL 31190863, *26 (D.N.J. Jan. 30, 2002) (finding sufficient motive and opportunity because the plaintiff established a concrete benefit to AT&T in avoiding the extra cash payment to complete the acquisition and showed how this was achieved by maintaining stock prices).  Here, Plaintiffs have merely pled that Interpool was motivated to falsify its financials in order acquire the North American intermodal division of Transamerica Leasing for $675 million in cash.  (¶ 47).  Notably, Plaintiff does not describe how maintaining a high stock price during the acquisition enabled Interpool to achieve a concrete benefit vis a vis the acquisition negotiations.  Id.  None of the cases cited by Plaintiff stand for the proposition that a defendant corporation's cash-based acquisition made during the class period, without more, may state a sufficient motive and opportunity to raise a strong inference of scienter.[6]  Therefore, Plaintiffs have not adequately pled that Interpool's acquisition of the North American intermodal division of Transamerica Leasing, Inc. establishes a strong inference of scienter.

Plaintiffs' next allegations of motive are that "Interpool needed to secure credit facilities,

_____

[6]  See, e.g., In re Ravisent Techs., Inc., No. 00-CV-1014, 2004 WL 1563024, at *10 (E.D. Pa. July 13, 2004) ("courts have found that a stock-based acquisitions [sic] at the time of the alleged misrepresentations support a strong inference of scienter.") (internal citation omitted);  In re AT&T 2002 WL 31190863, *26 ("Plaintiffs have established a concrete benefit to AT&T in avoiding the extra cash payment to complete the MediaOne acquisition and have also identified how that benefit could have been achieved if defendants were able to maintain higher stock prices until the close of that deal.").

which it did during the Class Period.  For example, in 2002, the Company obtained a $540

million asset-backed financing facility."  ¶ 141.  Similarly, Defendants were motivated to

artificially inflate their financial number [sic] "given the importance of Interpool's cash flow on

its debt rating." ¶ 110; see also ¶ 111 (explaining Interpool's motivation to release artificially

inflated numbers related to cash flow).  (Pl. Opp. 39-40).  However, as courts in this district

have recognized, "a company's desire to maintain a high bond or credit rating does not qualify

as sufficient motive for fraud … because if scienter could be pleaded on that basis alone,

virtually every company in the United States that experiences a downturn in stock price could be

forced to defend securities fraud actions."  Wilson, 195 F. Supp. 2d at 634. (internal citations

omitted).  Similarly, the Second Circuit has determined that this is insufficient to plead scienter.

See, San Leandro Emerg. Med. Grp. Profit, 75 F.3d 801, 813-814 (2d Cir. 1996) ("We do not

agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient

motive for fraud").  Plaintiffs do not cite any cases for the proposition that a strong inference of

scienter may be implied from a corporation's desire to secure credit facilities, or to inflate its

cash flow on its debt rating.  Indeed, these motives are the very sort that "are generally

possessed by most corporate directors and officers."  Thus, Plaintiffs have not adequately pled

that these corporate motives establish a strong inference of scienter.

Plaintiffs next contend that "Defendants were motivated to perpetrate this fraudulent

scheme in order to complete numerous offerings." (Pl. Opp. 40) (citing ¶ 142).  Plaintiffs cite to

the following specific examples:

> [O]n November 18, 2002, Interpool was able to complete its tender offer for its 6-
> 5/8% Notes due 2003 for $33.1 million. On November 25, 2002, Interpool
> completed its previously postponed subscription rights offering of up to

> $27,361,250 of 9.25% Convertible Redeemable Subordinated Debentures. Lastly, on February 11, 2003, Interpool completed an offering of $411.9 million of AAA rated asset-backed notes.

(Pl. Opp. 40 n.29) (citing ¶ 142).  Notably, however, Plaintiffs do not attempt to explain how the individual corporate Defendants stood to gain in "concrete and personal" ways from one or more of the alleged misleading statements or wrongful omissions via any of these offerings. See, Wilson, 195 F. Supp. 2d at 633.  Plaintiffs cite to the unpublished opinion of In re Resource Am. Sec. Litig., No. CIV. 98-5446, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) for its holding that a corporation's desire to raise capital by means of a secondary public offering could give rise to a "strong inference" of scienter.  That court based its holding on the finding that "the individual Defendants, as officers and directors of the company, would also benefit from the public and industry-wide perception of their successful leadership."  Id.  This Court, however, does not believe that the individual Defendants' ostensible desire to be perceived as successful leaders is a "concrete and personal" one that is not "generally possessed by most corporate directors and officers."  Cf. In re JP Morgan Chase Securities Litig., 363 F. Supp. 2d 595, 619 (S.D.N.Y. 2005) ("the desire for the corporation to appear profitable and … the desire to keep stock prices high to increase officer compensation are insufficient motives, whereas the desire to inflate stock prices while defendants sold their own shares may support a viable claim.") (internal citations omitted).  Therefore, this Court finds that Plaintiffs have not adequately pled that Interpool's numerous offerings establish a strong inference of scienter.

Accordingly, the Court concludes that all of Plaintiffs' allegations of "motive" are precisely the sort that are generally possessed by most corporate directors and officers, and which are continually found to be insufficient to plead a strong inference of scienter.  The Court

21

recognizes that Plaintiffs do not allege any specific, personal benefits that any of the individual Defendants might have sought to obtain from the alleged fraud.  Also, notably missing from Plaintiffs' pleadings are any allegations of insider trading or other insidious motivations typically, although not necessarily, found in corporate fraud cases.  Rather, the Court finds that although Defendants indeed had the opportunity to use their positions as heads of Interpool to commit fraud, Plaintiffs have not properly alleged facts to show that Defendants had the motive to do so.  Opportunity without motive is patently insufficient to pled a strong inference of scienter.

### 2.  Circumstantial Evidence of Reckless or Conscious Behavior:

Plaintiffs recite several alleged facts that they claim "give rise to a strong inference that the Defendants intentionally or recklessly made the misstatements."  (Pl. Opp. 29).

Indeed, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious [or reckless] behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  GSC Partners, 368 F.3d at 238 (internal citation omitted).  Moreover, Plaintiffs must plead such allegations of scienter with particularity.  See 15 U.S.C. § 78u-4(b)(2).  The allegations must be supported with the "who, what, when, where and how" of the events at issue. GSC Partners, 368 F.3d at 239 (quoting Burlington Coat Factory, 114 F.3d at 1422).

In the context of securities fraud, a reckless statement is one representing "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it."  Advanta 180 F.3d at 535 (quoting McLean v. Alexander, 599 F. 2d 1190, 1197 (3d

Cir. 1979)).  "An egregious refusal to see the obvious, or to investigate the doubtful, may in

some cases give rise to an inference . . . of recklessness."  Novak v. Kasaks, 216 F.3d 300, 308

(2d Cir. 2000) (internal citations omitted) (ellipsis in original).  Additionally, securities fraud

claims have sufficiently stated a claim based on recklessness where plaintiff has specifically

alleged that Defendants had "knowledge of facts or access to information contradicting their

public statements" such that defendants knew or should have known that they were

misrepresenting material facts related to the corporation.  Novak, 216 F.3d at 308.  At the same

time, however, corporate officials "need not present an overly gloomy or cautious picture."

Novak, 216 F.3d at 309 (citations omitted).

   The PSLRA, however, establishes a safe harbor protecting certain "forward-looking"

statements from Rule 10b-5 liability.[7]  15 U.S.C. § 78u-5.  So long as the forward-looking

statement is accompanied by sufficient cautionary language, the plaintiff must allege facts

showing that the defendant made the misstatement with actual knowledge that it was false or

misleading, rather than with mere recklessness. 15 U.S.C. §78u-5; see also Advanta, 180 F.3d at

536.  Neither the bespeaks caution doctrine nor the Safe Harbor provisions of the PSLRA

protect defendants from liability if a statement was knowingly false when made.  Advanta, 180

F.3d at 536. ; see also In re Alliance Pharmaceutical Corp. Sec. Litig., 279 F. Supp. 2d 171, 192

(S.D.N.Y. 2003)(citing In re Independent Energy, 154 F. Supp. 2d 741, 756-57 (S.D.N.Y.

---

   [7] A forward-looking statement is a "statement containing a projection of," inter alia,
"revenues, income, earnings per share, capital expenditures, dividends, capital structure or other
financial items" or "a statement of the plans and objectives of management for future operations,
including plans or objectives relating to the products or services of the issuer." See 15 U.S.C. §§
78u-5(i)(1)(A) and 78u-5(i)(1)(B).

2001)).  The safe harbor is inapplicable where, even though the statement is forward-looking,

the Defendant is in possession of historical or current information which makes the statement

nevertheless misleading.  Warnings are insufficient to insulate a party who makes statements

which even though forward-looking, are known to be untrue.  In re Regeneron Pharmaceutical

Sec. Litig., 1995 WL 228336 *5 (S.D.N.Y.); see also Alliance, 279 F. Supp. 2d at 192-93

(quoting In re Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)

("The doctrine . . . provides no protection to someone who warns his hiking companion to walk

slowly because there might be a ditch ahead when he knows with near certainty that the Grand

Canyon lies one foot away")).

Here, the first allegation Plaintiffs point to is the "letter prepared by Interpool's

independent auditors, KPMG, in a [sic] September 2002, summarizing some of the material

misstatements and problems that Interpool and the Individual Defendants failed to disclose."

(Id. at 32).  Plaintiffs assert that the KMPG letter is particularly significant in that it states the

following:

> Interpool had "significant deficiencies in the design or operation of internal
> control."  In particular:  "Executive management of the Company is regularly
> involved in the negotiations of complex business transactions that can have
> significant accounting implications to the Company's reported financial results."
> Likewise, Interpool "does not have an individual with sufficient level of
> understanding of [certain] accounting rules to be able to properly evaluate the
> accounting implications of Swap Derivatives entered into by the Company."
> These "deficiencies" resulted in departures "from US GAAP that [are] material to
> the Company's financial reporting" and had a "material impact."

(Pl. Opp. 32-33) (quoting portions of the KPMG Review).  Plaintiffs then contend that it "belies

common sense for Interpool to now claim that it did not knowingly issue false financial

statements about the company or, at the very least, acted with reckless disregard for the truth of

those statements given that a review substantially less in scope than the one required by auditing standards nonetheless revealed material deficiencies."  (Pl. Opp. 33) (citing to the complaint).

Plaintiffs further contend that the individual Defendants' arguments that they did not know about the financial implications of the transactions they negotiated "is only an admission that they acted with severe recklessness."  (Id. at 34).  Plaintiffs then emphasize the role that each of the individual Defendants held in the company and the fact that Interpool is not a large company, and conclude that it therefore "belies common sense for the Defendants to now argue that they did not know what was happening at Interpool."  (Id. at 34-36).

However, "[i]t is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts."  Advanta, 180 F.3d at 539 (quotations omitted).  See also GSC Partners, 368 F.3d at 239 ("Of course, it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false.").  Furthermore, allegations of scienter which merely assert that a defendant, by virtue of his or her position with a corporation "'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'"  Advanta, 180 F.3d at 539 (Quoting Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998)).  In short, "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."  Id. (Citing Rosenbloom v. Adams, Scott & Conway, Inc., 552 F.2d 1336, 1338-39 (9th Cir. 1977) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information necessarily attaches to those positions.")); see also In re

Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 470 (D.N.J. 2000) (noting that "allegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are inadequate to meet the PSLRA pleading standard").

Here, the Complaint fails to allege any specific circumstances or events in which the individual Defendants' actions involved "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or it is so obvious that the actor must have been aware of it.'"  Advanta, 180 F.3d at 539 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).  The basic thrust of Plaintiffs' argument is that Defendants lacked sufficient internal safeguards and controls to ensure that their accounting methods complied with GAAP.  The KPMG letter did not opine that Defendants knew that their accounting did not comply with GAAP, but rather that there were "significant deficiencies in the design or operation of internal control" and that there was no "individual with sufficient level of understanding" of certain accounting rules, resulting in material departures from GAAP.  (See Pl. Opp. 32-33).   However, courts generally will not permit allegations of fraud to stand in which the basis for the allegation is solely a large financial restatement or accounting error.  See, e.g., In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004) (citing Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 827-28 (8th Cir. 2003) for its holding that "allegations that defendants 'designed and implemented' improper accounting policies failed to state a claim for securities fraud in the absence of 'allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they

26

knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it. . . . Rote allegations that the defendants knowingly made false statements of material fact fail to satisfy the heightened pleading standard of the Reform Act.'"); In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 157 (2d Cir. 1998) ("one cannot state a claim for securities fraud merely by alleging a GAAP violation; the allegation must be accompanied by a statement of fraudulent intent."); Wilson v. Burnstock, 195 F. Supp. 2d 619, 642 n.16 (D.N.J. 2002) ("Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.") (internal citation omitted); In re SCB Computer Tech., Inc., Sec. Litig., 149 F. Supp. 2d 334, 353 (W.D. Tenn. 2001) ("the magnitude of the financial statement, without more, fails to indicate that the earlier financial statements were made with an intentional or reckless state of mind at the time they were made.").

> Plaintiffs argue that the holdings that
>
> GAAP violations, standing alone, are not actionable ... may be true when a GAAP violation is *de minimus* or a one-time violation, but repeated violations of GAAP – in this case, quarter after quarter for a period of three years and in a number of areas central to Interpool – must certainly be taken into consideration in determining whether there is a strong inference that the defendants intentionally *or recklessly* made the misstatements.

(Pl. Opp. 33, n.26) (emphasis in original).  Plaintiffs cite to P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 142 F. Supp. 2d 589, 608 (D.N.J. 2001) for its holding that "[w]hile it is true that a violation of GAAP will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter."  This Court agrees that GAAP violations, in conjunction

27

with other evidence of fraudulent intent, may support a strong inference of scienter.  Conversely,

evidence of GAAP violations, without more, cannot support a strong inference of scienter.  In

addition, as the P. Schoenfeld court stated, "a restatement of earnings, without more, does not

support a strong inference of fraud, or for that matter, a weak one." Id. at 612.  Plaintiffs next

cite Lewin v. Lipper Convertibles, L.P., 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) for

its statement that "[w]hile mere allegations of a failure to proceed in accordance with GAAP

and GAAS are not sufficient to allege scienter, here, the accounting violations alleged are on

such a repeated and pervasive scale that, if proven, they could provide strong circumstantial

evidence of recklessness."  (See Pl. Opp. 33-34, n.26).  That case, however, is factually

inapposite from the case at bar.  The Lewin case dealt with an allegation that the defendant,

PriceWaterhouseCoopers, who was the auditor for the defendant partnership, "recklessly

blinded itself to the [Defendants'] illicit activity, failed to follow general accounting principles,

and improperly gave clean opinions on the partnership's financial statements."  Lewin, 2004

WL 1077930 at *1.  The Court finds it significant that the PriceWaterhouseCoopers defendant

in the Lewin case is an international accounting and consulting firm.  The corporate Defendants

in this case, however, are not alleged to be in the business of auditing, and in point of fact, the

KMPG letter opined that Interpool "does not have an individual with sufficient level of

understanding of [certain] accounting rules to be able to properly evaluate the accounting

implications of Swap Derivatives entered into by the Company."  (See Pl. Opp. 33).  In short

then, while the Defendants' alleged GAAP violations and lack of understanding may provide

evidence of corporate mismanagement, it is well established that "such claims are not

cognizable under federal law." Alpharma, 372 F.3d 151 (citing Advanta, 180 F.3d at 540; In re

Digital Island Sec. Litig., 357 F.3d 322, 332 (3d Cir. 2004)).

Plaintiffs further contend that the individual Defendants were, at the very least, acting

with severe recklessness, given that each of them signed the annual Form 10-Ks.  (Pl. Opp. 36).

This is so, Plaintiffs argue, because the individual Defendants "falsely represented to the

investing public in these SEC filings that the financial statements were presented in accordance

with GAAP."  (Id.).  However, as the Third Circuit recognized in the non-precedential case of In

re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. Appx. 465 (3d Cir. 2004) the fact

that Defendants signed financial disclosures indicating that they complied with GAAP does not

imply that they made misstatements with scienter.  Specifically, the Third Circuit found that

"[e]ach of [defendant's] financial disclosures contained boilerplate language that the procedures

used in the reports conformed with GAAP.  [Plaintiff] points to this language as proof that the

GAAP violations were made with fraudulent intent.  Again, however, this language does not

show that [defendant] knew that its procedures violated GAAP prior to its restatement of

earnings in July 2002."  Id. at 470.[8]

Plaintiffs next allege that Defendants Tuchman and Witteveen personally guaranteed the

debts of PCR, which precluded Interpool from treating the purported sale of PCR as a

discontinued operation under GAAP.  (Pl. Opp. 37) (citing ¶ 36) "Moreover, the Special

Counsel's Report also found that defendant Gordon failed to disclose to Interpool's auditors

numerous instances of the Company's continuing involvement with PCR, even though the

auditors had instructed him on the accounting rules that applied to the purported 'sale' of PCR".

_____

[8]  While not precedential, this Court finds this cited authority persuasive and agrees with
its reasoning.

(Pl. Opp. 37) (citing ¶ 36; <u>see also</u> ¶ 112).  "This fact alone *establishes* that these three Individual Defendants, and the Company for which they act, *knew* that the financial statements were inaccurate when issued."  (<u>Id.</u>) (emphasis in original).

The Court notes that this allegation relates solely to a technical accounting issue regarding how to account for a subsidiary.  Plaintiffs point to language in the Special Counsel's Report (the "Report") which states that "defendant Gordon failed to disclose to Interpool's auditors numerous instances of the Company's continuing involvement with PCR, even though the auditors had instructed him on the accounting rules that applied to the purported 'sale' of PCR."  (Pl. Opp. 37) (citing ¶ 36).  However, as Defendant Gordon points out in his reply brief, the Report merely states that Mr. Gordon had been "instructed" regarding certain technical accounting rules.  (Gordon Reply 6).  Notably, the report did "not state that he:  (a) understood those rules; (b) deliberately ignored them to distort the accounting for the PCR transaction; or (c) personally benefitted from PCR's erroneous treatment as a discontinued operation."  (<u>Id.</u>).  Similarly, Plaintiffs have not alleged any facts tending to show that Defendants Tuchman or Witteveen had any reason to know the accounting consequences on Interpool's financial statements that their guarantees would have.  (<u>See</u> Tuchman Reply 1; Witteveen Reply 5).  Defendants essentially argue that such a technical violation under the alleged circumstances is insufficient to support a finding of "recklessness," and therefore scienter.  The Court agrees.  As the Third Circuit defined it in <u>Advanta</u>, a "reckless statement" for securities fraud purposes is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

Advanta 180 F.3d at 535 (quoting McLean v. Alexander, 599 F. 2d 1190, 1197 (3d Cir. 1979)).

In short, it is highly likely that every day in corporate America corporate finance officers

negligently omit or misstate information concerning technical accounting issues on which they

have in fact received instruction at some point or other.  Indeed, corporate finance officers are

expected, even apart from specific instructions, to be familiar with pertinent accounting rules

and to follow them accordingly.  Nevertheless, the mere fact that an arcane aspect of accounting

and auditing principles has been ignored by that corporate official, even to an extent constituting

"inexcusable negligence" is insufficient in itself to demonstrate scienter.  See Advanta 180 F.3d

at 535.  Indeed, courts in this and other Circuits, when confronted with the issue of whether a

GAAP or GAAS violation demonstrates sufficient scienter to be actionable as reckless

invariably look to see whether or not underlying red flags are present.  See e.g. P. Schoenfeld,

142 F. Supp. 2d at 608 (citing numerous cases where courts focused on "red flags" to infer

fraudulent intent);[9] In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 651 (E.D. Va.

---

[9]  In particular, the Court in P. Schoenfeld cited the following cases for this proposition: In re First Merchants Acceptance Corp. Sec. Litig., 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998) ("Other circumstances suggesting fraudulent intent can include the presence of 'red flags' or warning signs that the financial reports are fraudulent, as well as the magnitude of the alleged fraud."); Miller v. Material Sciences Corp., 9 F. Supp.2d 925, 927 (N.D.Ill.1998) ("[d]eliberately ignoring 'red flags' such as those alleged here can constitute the sort of recklessness necessary to support 10(b) liability."); Rehm v. Eagle Finance Corp., 954 F. Supp. 1246, 1256 (N.D.Ill.1997) ("[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy"); In re Health Management Sec. Litig., 970 F. Supp. 192, 203 (E.D.N.Y.1997) (allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent); In re Leslie Fay Companies, Inc. Sec. Litig., 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("in cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b-5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may determine that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading.").

2000) ("the magnitude and pervasiveness of MicroStrategy's financial restatements and the

relative simplicity of the accounting principles violated . . . lend further probative weight to

Plaintiff's allegations that the GAAP violations in this case raise a strong inference of

scienter."). Such is simply not the case here.

Finally, Plaintiffs allege that the timing of the resignations of Defendants Witteveen and

Gordon gives rise to a strong inference of their knowledge of the fraud. (Pl. Opp. 37).

Specifically, Plaintiffs allege that:

> "On October 10, 2003, Interpool announced that after a preliminary report by an
> independent outside law firm appointed by the Audit Committee of the Board of
> Directors to investigate accounting issues, the Board had accepted the resignation
> of Raoul Witteveen as President and Chief Operating Officer and a member of the
> Board, effective immediately." ¶ 5; see also ¶¶ 9, 88. "On July 18, 2003, Gordon
> resigned as an employee and officer of the Company following the Company's
> announcement that a Special Counsel had been appointed by the Company's
> Audit Committee to investigate the circumstances surrounding the Company's
> restatement of its historical financial statements." ¶ 18. The same day, the
> "Company also announced that the SEC had opened an informal investigation into
> the Company's accounting practices." ¶ 87; see also ¶ 90(b), 123. The most
> logical and plausible inference to be drawn from these "resignations" is that
> Witteveen and Gordon were committing accounting fraud and they were therefore
> terminated.

 (Pl. Opp. 37-38). However, the Third Circuit, and other courts have found resignations of key

officers to be insufficient to show that they acted with the requisite scienter to commit the

alleged fraud. See, e.g. In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. Appx.

465 (3d Cir. 2004) (marked non-precedential) (declining to find that the allegation that nine

employees were fired as a result of accounting irregularities supported a strong inference of

scienter);[10] Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) (finding that

---

[10]  While not precedential, this Court finds this cited authority persuasive and agrees with
its reasoning.

32

resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications").  Furthermore, this Court is satisfied that even if Defendants Witteveen and Gordon were in fact terminated due to the improper accounting in the financial statements, this does not show that they acted with scienter.  Indeed, a corporation may choose to terminate employees for making errors due to negligence, oversights, etc., or simply for incompetence.  This Court, however, may not infer scienter unless it is satisfied that the Defendants acted with reckless or conscious behavior.

The Court also recognizes that by Plaintiffs' own admission, Interpool's restatement of their historical financial statements did not uniformly result in a decrease to Interpool's reported income or assets.  Some of the restated figures in fact resulted in an increase to reported income, or an increase to income in one year, and a decrease to income in another.  (See, e.g. Pl. Opp. 16 ("net income was materially *understated* by $.2 million for the year ended December 31, 2000.") (emphasis added)).  The Court finds that this tends to negate an inference that Defendants acted with intent to perpetrate a fraud on investors via false and misleading financial statements.

In sum, "[l]ooked at as a whole, plaintiffs' allegations rest on nothing more than a series of inferences ... too tenuous to amount to one of those highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care."  Alpharma, 372 F.3d 151 (internal citation omitted).  Thus, the Court concludes that Plaintiffs have failed to state a Rule 10b-5 claim premised on conscious or reckless conduct.  Therefore, because Plaintiffs have failed to properly plead motive and opportunity, or alternatively, evidence of conscious or reckless behavior, their

complaint must be dismissed for failure to plead a strong inference of scienter.


B.  Section 20(a):

Section 20(a) of the Exchange Act imposes liability for "controlling persons" in a

registered corporation.  See 15 U.S.C. § 78(t)a.  To successfully allege a cause of action

pursuant to Section 20(a), a plaintiff must allege "(1) a primary violation [of federal securities

laws] by a controlled person or entity; and (2) circumstances establishing control of a primary

violator."  Campbell Soup, 145 F. Supp. 2d at 599 (citation and quotation omitted).  Claims

pursuant to Section 20(a) are "derivative – requiring proof of a separate underlying violation of

the Exchange Act."  In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 474 (D.N.J.

2000).  A Section 20(a) claim, therefore, cannot lie in which the plaintiff has not properly

alleged a primary violation of the Exchange Act.  See Advanta, 180 F.3d 525, 541 (3d Cir.

1999); In re Party City Secs. Litig., 147 F. Supp. 2d 282, 317 (D.N.J. 2001) ("[T]o state a claim

under [Section] 20(a), a plaintiff must plead a predicate violation of the '34 Act or its rules and

regulations.") (quoting Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697,

703 (2d Cir. 1994)).

Because the consolidated amended class action complaint has failed to plead

successfully a predicate violation of Section 10(b), Rule 10b-5, or Section 11 of the Exchange

Act, Plaintiffs' Section 20(a) claims against Defendants Witteveen, Gordon, Geoghan, and

Tuchman as "controlling persons" of Interpool must be dismissed.


C.  Leave to Amend:

Leave to amend a complaint under Rule 15 will be denied where, as here, amendment would be futile. <u>See</u>, <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962). Courts in this Circuit dismiss complaints with prejudice under the PSLRA where plaintiffs request leave to amend while opposing a motion to dismiss but offer no representation as to new information or amendments that would cure the defects in the pleading. <u>GSC Partners</u>, 368 F.3d at 246 (affirming dismissal with prejudice where plaintiffs "offered no additional facts that would cure their amended complaint."). As the Third Circuit reasoned, the purpose of the PSLRA is "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." <u>Id.</u> (internal citations omitted). Liberally granting plaintiffs leave to amend, especially where they have not suggested that they have developed new facts or how they would cure defects in the pleadings, would frustrate that purpose. <u>Id</u>.

Had this Court concluded that dismissal was appropriate due to a technical or correctable failure in Plaintiffs' pleadings, it may have been appropriate to grant Plaintiffs leave to amend their complaint. However, Plaintiffs request leave to amend in a footnote wherein they fail to explain the basis for this request or offer how they would cure the defects if they were to amend their complaint. (Pl. Opp. 66 n.40). Furthermore, having reviewed all of the pleadings thus far, the Court is satisfied that Plaintiffs would be unable to amend their complaint in such a way as to plead a strong inference of scienter. Under these circumstances, the Court finds it appropriate to dismiss the complaint with prejudice.

## CONCLUSION:

For the foregoing reasons, Defendants' motions to dismiss the consolidated amended

class action complaint will be GRANTED WITH PREJUDICE.[11]  The Court will enter an

_____

[11]  The Court notes that Defendants contend that any claims arising out of events prior to June 29, 1999 are time-barred.  (Interpool MTD 37-38).  This is because prior to the enactment of the Sarbanes-Oxley Act, claims brought under the Exchange Act were time-barred unless asserted within one year after discovery of the facts constituting the alleged violations, and in no event more than three years after the occurrence of the alleged violation.  See, Lampf, Pleva, Lipkind, Prubis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  When the Sarbanes-Oxley Act (the "SOA") was enacted on July 30, 2002, it lengthened the statute of limitations for these claims to the earlier of two years after discovery of the fraud or five years after the violation.  See, 28 U.S.C. § 1658(b); Public Company Accounting Reform and Investor Protection Act of 2002, Pub. L. No. 107-204, Title VIII § 804(b), July 30, 2002, 116 Stat. 801.  Plaintiffs, however, contend that the SOA's five-year statute of limitations serves to retroactively revive actions that were already moribund on its effective date.  (Pl. Opp. 57-64).  For example, Plaintiffs cite to the Second Circuit case of Aetna Life Ins. Co. v. Enter. Mortgage Acceptance Co., LLC (In re Enter. Mortgage Acceptance Co., LLC Sec. Litig.), 391 F.3d 401, 410 (2d Cir. 2004) for the proposition that "Section 804 of the Act did have retroactive effect to the extent that it 'puts defendants back at risk at a point when defendants reasonably believe they are immune from litigation, stripping them of a complete affirmative defense they previously possessed and may have reasonably relied upon.'" (Pl. Opp. 62) (quoting from Aetna, 391 at 410).  However, if Plaintiffs had read the full paragraph they cited to from that Opinion, they would have noticed that it begins, "In our view, the resurrection of previously time-barred claims has an _impermissible retroactive effect._ Extending the statute of limitations retroactively increases a defendant's liability for past conduct, by increasing the period of time during which a defendant can be sued."  Aetna, 391 at 410(internal citation omitted, emphasis added).  The Second Circuit then went on to find that the plaintiff's complaint was indeed time barred because of the "impermissible retroactive effect."  Id. at 410-11.  Similarly, courts in this Circuit have found that the SOA does not apply retroactively to revive such actions.  See, e.g., L-3 Communications Corp. v. Clevenger, 2004 WL 1941248 at *6 (E.D. Pa. Aug. 31, 2004) ("Because the language of § 804 is ambiguous, I am bound to apply the Landgraf-Hughes presumption against revival of time-barred claims."); Lieberman v. Cambridge Partners, LLC, 2004 WL 1396750 at *3 (E.D. Pa. Jun. 21, 2004) ("Several courts ... set forth thorough and persuasive analyses demonstrating that it is impermissible to utilize SOA § 804 to revive claims that were time-barred when the SOA took effect on July 30, 2002, regardless of whether the case pursuing those claims was filed before or after July 30, 2002.  The Court agrees with those decisions and adopts their rationales as though restated herein.").  This Court agrees that it is impermissible to utilize SOA § 804 to revive claims that were time-barred when the SOA took effect on July 30, 2002.  However, in light of the fact that Plaintiffs' complaint will be dismissed in its entirety for failure to plead scienter, the Court need not parse through which claims of Defendants' alleged actions or omissions in particular must be dismissed as time-barred.

The Court further notes that Defendants also contend that several of Plaintiffs' claims should be dismissed because they merely allege corporate mismanagement.  (See, Interpool MTD

36

appropriate Order.

_____
s/
Stanley R. Chesler, U.S.D.J.

DATED:  August 16, 2005

_____

29-32).  Specifically, Defendants contend that Plaintiffs' "allegations that Interpool lacked internal controls, employed faulty communication procedures, did not properly monitor its accounting department staff, or that certain defendants lacked an understanding of particular provisions of GAAP are not securities 'manipulation' actionable as securities fraud under Section 10(b) or Rule 10b-5."  (Id. at 30).  Indeed, as Plaintiffs concede, Section 10(b) liability will not attach to "transactions which constitute no more than internal corporate mismanagement."  Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479 (1977).  Plaintiffs accuse the Defendants of attempting to "rewrite" their complaint in such a way as to make the claims sound in mismanagement, while they are really viable claims of fraud.  (Pl. Opp. 44-46) ("[w]hile the attempt to rewrite Plaintiffs' Rule 10b-5 claim is not an unusual tactic for defendants in securities cases, courts across the country have soundly rejected it.").  However, this Court recognizes that at least some of Plaintiffs' claims are indeed properly characterized as mere allegations of mismanagement.  See, In re Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 639 (3d Cir. 1990) ("claims *essentially grounded* on corporate mismanagement are not cognizable under federal law.") (emphasis added).  For example, Plaintiffs allege that Interpool's financial numbers were false, in part, because "Interpool **lacked adequate internal controls** and was therefore unable to ascertain the true financial condition of the Company."  (Pl. Opp. 11, citing to ¶ 42) (emphasis in original).  However, the Third Circuit has explicitly found that "the concerns underlying the securities acts are not implicated simply because management has failed to characterize ... its financial reporting and accounting controls and inadequate and ineffective."  Craftmatic 890 F.2d at 640.  Therefore, this Court finds that so far as Plaintiffs' allegations indeed merely implicate Defendants for acts of mismanagement, they are not actionable under federal law.  However, in light of the fact that Plaintiffs' complaint will be dismissed in its entirety for failure to plead scienter, the Court need not determine which of Plaintiffs' allegations in particular are properly characterized as claims of mismanagement.